**In the Matter of Norman and Betty KRAMER, Debtors.**

**Bankruptcy No. BK87–3176.**

United States Bankruptcy Court, D. Nebraska.

Feb. 8, 1989.

Arlan Wine, Wauneta, Neb., for debtors.

Terry Curtiss, Alliance, Neb., for Metropolitan Life Ins. Co., hereafter referred to as Metropolitan.

George Vinton and Tim Thompson of Kelley, Scritsmier, Moore & Byrne, P.C., North Platte, Neb., for Farm Credit Bank of Omaha.

Steven Turner of Baird, Holm, McEachen, Pedersen, Hammann & Strasheim, Omaha, Neb., and Alvin R. Wall, Holyoke, Colo., for Production Credit Ass'n of Sterling.

## MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Hearing was held on January 31 and February 1, 1989, in North Platte, Nebraska, on motion for turnover filed by the debtors and motions to dismiss filed by creditors. Arlan Wine of Wauneta, Nebraska, appeared on behalf of the debtors. Terry Curtiss of Alliance, Nebraska, appeared on behalf of Metropolitan Life Insurance Company, hereafter referred to as Metropolitan. George Vinton and Tim Thompson of Kelley, Scritsmier, Moore & Byrne, P.C., North Platte, Nebraska, appeared on behalf of the Farm Credit Bank of Omaha. Steven Turner of Baird, Holm, McEachen, Pedersen, Hammann & Strasheim, Omaha, Nebraska, and Alvin R. Wall, P.O. Box 305, Holyoke, Colorado, appeared

on behalf of Production Credit Association of Sterling.

## History of the Case

The debtors are residents of the State of Colorado. They owned real estate in Colorado and Nebraska which was used for farming operations. They were debtors in a previous case under Chapter 11 filed in the District of Colorado. After a period of time in the Colorado Chapter 11, the debtors obtained approval of the court to dismiss the Chapter 11 case in Colorado. The creditors proceeded to partial completion of foreclosure actions in both Nebraska and Colorado resulting in the appointment in receivers in Nebraska and Colorado and the sale of some personal property and some real estate in the State of Colorado.

Prior to the completion of all sales of property and the expiration of redemption periods, the debtors filed this Chapter 11 case in the District of Nebraska. Various creditors filed motions to dismiss and motions for relief from the automatic stay. Eventually this Court granted relief from the automatic stay with regard to all property located in the State of Colorado but denied the motion for relief with regard to property located in Nebraska. The Court also overruled any other motions concerning the validity or invalidity of the filing in Nebraska.

Shortly after the filing of the Chapter 11 case in Nebraska, the creditors moved for an order excusing the Nebraska receiver from turning over property to the debtors. Debtors resisted such motion and trial was held on April 28, 1988. The Court found that the evidence presented by the creditors was more credible than the evidence presented by the debtors. The Court ruled in favor of the receiver, excusing turnover and made a factual finding that there was little likelihood of an effective reorganization being possible. That ruling has been appealed and is pending before the District Court.

Although debtors were not permitted to take possession of the property and operate the farm unit in 1988, they did proceed through the reorganization process. They filed a plan of reorganization and a disclosure statement. The disclosure statement has been approved. The plan was sent to all interested parties and ballots were received. Several creditors filed objections to the plan. A confirmation hearing was then scheduled.

In the fall of 1988, the debtors moved for turnover of the property. Creditors resisted and this trial resulted. On the day of trial the debtor withdrew the plan of reorganization and counsel stated on the record that a new plan would be filed which would reflect, among other things, increases in the value of the collateral of the secured creditors, representing the increase in land value since the plan was originally filed.

## Facts

Debtors own real estate in Chase County, Nebraska, that they propose to use in the reorganization process. There are approximately 1,900 acres and for 1989 the debtors propose to plant 329 acres of corn, 763 acres of pinto beans, to place 98 acres in government programs and rent 550 acres of corn land to other parties. For 1990 and thereafter they propose an additional 132 acres to be used for growing wheat. Such land would not be available to the debtors during the 1989 growing season because it is subject to a lease entered into by the receiver for the 1989 crop year. The land is currently valued at $1,338,086 by agreement of the parties which was entered into evidence as Exhibit 11. Debtors also own a Valley center pivot irrigation system worth $12,500 and various other items of personal property, including some farming equipment for total assets of a value of approximately $1,500,000.

The total debt is approximately $1,800,-000. Neither the asset value listed above nor the debt amount include assets held by the receiver or real estate taxes due, which basically balance each other off in the calculation of total asset and total debt.

Debtors presented a cash flow projection for 1989 at Exhibit 1. The cash flow makes basic assumptions about timing of revenue and timing and amount of production expenses and concludes that the debt-

ors will have as a result of operations for 1989 a net income after expenses and before debt repayment in the approximate amount of $230,000. However, debtors erroneously include $34,216 to be received in October of 1989 from government program payments as income in 1989. Testimony by the debtor, Norman Kramer, and other witnesses convinces this Court that the debtor will not receive government payments in the fall of 1989 and, therefore, the net income before debt repayment should be reduced by approximately $34,000. This reduction leaves a net income of $196,000.

The debtor, Norman Kramer, testified that the cash flow projections were conservative with regard to yield from crops and crop prices and that the expense figures were determined by actual investigation of the costs necessary for planting and harvesting the proposed crops. Norman Kramer's testimony was supported by the testimony of a neighboring farmer who is also an agent of a lending company, Ag Services of America, Inc. That lender had reviewed the cash flow projections and, based upon such projections, had committed to providing the funding necessary for the input costs.

Additional support for the validity of the projections of both yield and cost of production came from the testimony of Dr. Gary Hergert, an agronomist with the University of Nebraska Extension Service. He testified at length on direct and cross examination that the yields projected and costs were possible based upon the application of fertilizer, herbicide and insecticide as testified to by Norman Kramer with regard to the amounts which would be applied.

The Sterling Production Credit Association (PCA) presented evidence that the expenses listed by Mr. Kramer were too low based upon the experience of borrowers from the PCA and based upon the experience of the current tenants of the real estate.

This Court accepts the testimony of Dr. Gary Hergert as more convincing and based upon more reliable information concerning the application of fertilizer and chemicals and the costs necessary to be incurred to raise the corn and bean yield projected by the debtors. However, even if the PCA testimony was accepted over Dr. Hergert's testimony, the debtor would still show a net income before the payment of long-term debt in the amount of $102,000 for the crop year 1989. Both the debtors' projected net income before payment of debt in the amount of $196,000 and the PCA projected net income in the amount of $102,000 far exceeds the net income the receiver has obtained from leasing the property during the 1988–1989 crop season. The receiver leased the property in three parcels plus a house and has received a gross rental income of less than $90,000. That income figure should be reduced by whatever the receivership expenses are and further reduced by the currently due real estate taxes of approximately $24,000. Debtors' cash flow projection has already deducted the real estate tax payment prior to arriving at the net income of $196,000.

Debtor, Norman Kramer, testified that he has arrangements made with Ag Services of America, Inc., to obtain all necessary input costs plus the deposit required to be paid to the electric company for operation of the irrigation equipment. That testimony was not contradicted either by the agent for Ag Services of America, Inc., or any other evidence. The agent of Ag Services of America, Inc., acknowledged that it would not lend monies needed by the debtors for family living expenses or repairs or certain other cash outlays necessary for the operation. However, the agent was not asked whether or not Ag Services of America, Inc., would advance the funds necessary for the electric deposit. This Court believes it to be more logical that Ag Services of America, Inc., would advance the funds necessary for the electric deposit to operate the irrigation equipment if they were going to advance funds for the input of the crop that required the electricity for the operation of the irrigation system. It seems that to loan money for seed, fertilizer, chemicals, fuel and refuse to loan money to enable the farmer to turn on the water which will help each of those elements result in a crop would be a curious

business decision. Therefore, the Court concludes as a fact that the debtor will have a source of financing for the input, the irrigation and the harvesting expenses and will be able to finance necessary living costs and repairs by the use of federal government advance farm program payments and the ability of the debtors to assign rights in payments to be received later from the government programs which payments would result from the 1989 operations.

The debtors' cash flow at Exhibit 1 shows a negative cash balance until the fall months. The most convincing evidence is that the lender, Ag Services of America, Inc., would fund most of that negative balance and the debtor would be required to make up the difference with the advance government payment in April of 1989.

The debtors have operated this ground which was included in a larger farming operation and have done so for many years. Their 20–year old son testified as to his farming experience and his willingness to work for his parents to supplement his father's labor. He is also willing to permit his parents to rent certain farm equipment that he owns. A lease which has been executed by the parents and the son is in evidence. There is no question that the son owns the equipment and that the equipment is the type of equipment necessary to complete the farming operations as proposed. Debtors will be required to obtain the use of other equipment on short-term rentals, depending upon the weather conditions, but only the PCA witness was concerned that the amount of equipment and labor projected to be used by the debtors during the 1989 farming season was insufficient. The debtor, Norman Kramer, the neighboring farmer who is the agent of Ag Services of America, Inc., the debtors' son who is a farmer familiar with this farming operation, the agronomist and another witness presented by the debtors who has had extensive farm management experience, all testified that the equipment owned, leased and that which could be rented would be sufficient to complete this farming operation successfully in the crop year 1989. The Court finds that the debtors do have

sufficient access to equipment to successfully complete the farming operation in 1989.

## Conclusions of Law

■ The Bankruptcy Code at 11 U.S.C. § 543 requires a custodian in possession of property of the estate at the commencement of the bankruptcy case to turn over such property to the trustee and make an accounting unless the Bankruptcy Court after notice and a hearing excuses such turnover. The Bankruptcy Court may excuse such turnover if "the interests of creditors ... would be better served by permitting a custodian to continue in possession, custody or control of such property." 11 U.S.C. § 543(d).

A receiver acting under state court authority is a custodian for purposes of the Section 543 turnover requirements.

■ In 1988 this Court, after notice and a hearing, made factual findings that it was in the best interests of the creditors to excuse the receiver from delivering the property to the debtors. That decision was based upon evidence that the debtors could not attain the financial projections which they had presented to the Court. In addition, the Court at that time made a determination that no Chapter 11 reorganization was likely or feasible because of the Court's perception of the law that there was no exception to the absolute priority rule codified at 11 U.S.C. § 1129(b)(2)(B)(i) and (ii). That Code section prohibits the confirmation of a Chapter 11 plan unless, with respect to a class of unsecured claims, which has voted against the plan as a class, the plan provides each claim will receive property of a value equal to the allowed amount of the claim or the debtor, as an equity holder or interest holder will not retain any property. At the time of the hearing in 1988, the Supreme Court had recently decided the case of *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), and it appeared to the Court that there was no exception to the "absolute priority rule" as above codified. However, recently the

United States Court of Appeals for the Eighth Circuit decided the case of *In re Blankemeyer*, 861 F.2d 192 (8th Cir.1988). This case was an appeal from the Bankruptcy Court and District Court for the District of Nebraska. In the *Blankemeyer* case the Circuit Court states: "Moreover, the district court found that under the plan the debtors would retain an equitable ownership interest. Consequently, it was incumbent upon the debtors to show that any dissenting unsecured creditor would be provided for in full before any junior class of unsecured creditors could receive or retain any property under the plan, *unless the junior class contributed something reasonably compensatory and measurable to the reorganization enterprise.*" *Id.* at 194 (emphasis added).

 It, therefore, appears to the Court this year that the Eighth Circuit Court of Appeals has suggested a possible exception to the "absolute priority rule" if the debtors contribute something "reasonably compensatory and measurable to the reorganization enterprise." In this case, the disclosure statement which has been approved and the plan which was withdrawn on the hearing date describe a procedure whereby the debtors would have the Court value the retained interest of the debtors and the debtors would contribute "something reasonably compensatory and measurable to the reorganization enterprise" to pay for that retained interest. Even though the plan has been withdrawn, the disclosure statement and the plan are in evidence. Based upon *Blankemeyer,* the Court determines that it cannot base its decision this year on debtors' inability to reorganize as a result of the *Ahlers* decision or as the result of the "absolute priority rule."

 The creditors have suggested that the cash flow presented at Exhibit 1 shows on its face that in the long run it will not fund a plan which even pays the asset value to the creditors, let alone the actual amount of the debt owed to the creditors. It therefore follows, suggest the creditors, that no plan is realistic and the Court should not permit these debtors to take possession of their property under such circumstances by which they are foredoomed to failure in this reorganization process.

However, this Court concludes that it is simply the burden of the debtors at the hearing held this year to convince the Court that allowing them to take possession as all other debtors do in Chapter 11 cases will, for the immediate future at least, be in the best interests of the creditors. It is not the debtors' burden to prove at a hearing on a motion for turnover that a plan can be confirmed. If that were the burden, it is unlikely that many Chapter 11 debtors would obtain turnover orders under Section 543. This Court believes that the Section 543 turnover requirements are not as detailed or as onerous as the requirements the debtor must comply with in order to obtain confirmation of a plan of reorganization.

 Under Section 543 of the Bankruptcy Code, the presumption is in favor of the debtor exercising the powers of the trustee. That favorable presumption was rebutted satisfactorily in 1988 by the creditors. However, the debtors have now presented satisfactory evidence to convince this Court that a turnover of the land is in the best interest of creditors as a result of a mathematical calculation found in the findings of fact. Whether the Court accepts the net income projections of the debtor as being most likely to occur, or accepts the net income projections presented by the PCA, the net funds available to the estate for the benefit of all parties in interest is greater with the debtors' operating authority than it is under the cash rent leases as entered into in the past. Since the net benefit is greater with debtors in possession they should be granted possession.

### Summary

The receiver is ordered to grant possession of the Chase County land to the debtor in possession subject to whatever rights the tenants have under the leases now in effect. The receiver is authorized to return to State Court to obtain necessary orders to protect his standing under the state stat-

utes. The receiver is not required to terminate the receivership or to turn over the non-real estate assets now being held by the receiver which are the subject of adversary proceedings to determine the existence and extent of liens. The receiver is only required to turn over the land and the improvements thereon, including irrigation equipment. All questions concerning the receivership expenses and fees and distribution of assets held by the receiver are left undecided by this order.

Separate journal entry shall be entered.

## JOURNAL ENTRY

Before a United States Bankruptcy Judge for the District of Nebraska regarding motion for turnover filed by the debtors and motions to dismiss filed by creditors.

IT IS ORDERED:

Motions to dismiss overruled. Motion to order receiver to turn over property of the estate to the debtors in possession is granted. See memorandum this date.